# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: ) | | |
| RESOURCE TECHNOLOGY CORP., ) | | |
| ) | | |
| Debtor, ) | Case No. 10 C 3173 | |
| ) | | |
| ------------------------------------------------- ) | | |
| ) | | |
| SAMUEL J. ROTI, ) | | |
| ) | | |
| Appellant, ) | | |
| ) | | |
| vs. ) | | |
| ) | | |
| CONGRESS DEVELOPMENT CO., ) | | |
| ) | | |
| Appellee. ) | | |
| ) | | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Samuel J. Roti appeals from a bankruptcy court order denying his administrative claim against the Chapter 7 bankruptcy estate of Resource Technology Corporation (RTC). Roti seeks compensation for losses sustained due to the migration of landfill gas onto his hotel property. For the reasons set forth below, the Court affirms.

### Background

The Court takes the following facts from the parties' submissions in this appeal and stipulation before the bankruptcy court.

Congress Development Company (Congress) owned and operated a landfill in Hillside, Illinois. In October 2002, Markwell Hillside LLC (Markwell) purchased a

Holiday Inn hotel next to the landfill. Roti was the sole member and manager of Markwell and is the assignee of Markwell's claim in RTC's bankruptcy.

Landfills in Illinois must comply with state and federal requirements for the collection and treatment of landfill gas. From 1992 to 1996, Congress controlled landfill gas at its Hillside landfill using a flare system. Congress also used a perimeter gas well system to prevent underground gas migration. In 1996, Congress contracted with RTC to construct and operate a gas collection and control system (GCCS) at the landfill to replace the flare system. A GCCS performs two functions. First, it draws landfill gas from waste disposal cells using a vacuum, reducing the migration of landfill gas into the atmosphere. Second, it destroys potentially harmful and odorous components through combustion. Congress continued to operate the perimeter gas well system.

RTC entered bankruptcy in 1999. It operated as a debtor in possession until the bankruptcy court appointed a Chapter 11 trustee in 2003. On September 21, 2005, the bankruptcy court converted the case to a Chapter 7 proceeding and appointed a Chapter 7 trustee.

Conditions at the landfill deteriorated beginning around 2002, as Roti later described in a brief filed in the bankruptcy court:

> Beginning no later than 2002, Congress's consultants were aware that landfill gas at the Landfill was not being collected properly by RTC. . . . RTC's monthly reports always showed exceedances [sic] or deviations from [the Illinois Environmental Protection Agency]'s requirements in at least some of the categories of oxygen, temperature, pressure and/or nitrogen. . . .
>
> In June 2004, an expert retained by Congress in RTC's bankruptcy proceedings, Bryan Stirrat, concluded that "RTC has not operated or maintained the gas collection system at the Hillside Landfill in accordance with the applicable industry standards for the generation of electricity from landfill gas." Mr. Stirrat described a "history of high pressure gas readings, broken fittings, broken

> valves, broken wellheads, and broken sampling ports indicated an apparent total disregard for the importance of maintaining the gas collection system in a manner consistent with industry standards and recognized operational practices." Mr. Stirrat also wrote that RTC had gas collection wellheads "wrapped in plastic bags and duct tape."
>
> Conditions at the Landfill worsened between 2004 and 2005. . . .
>
> However, it was in 2005 when Congress's representative thought that the conditions in the Landfill "went up the asymptotic curve" and got "really bad." In early 2005, Congress's consultant, Dr. Jay Corgiat, discussed with RTC at a meeting what he believed needed to be done in the well field at the Landfill. RTC responded that it "didn't want to do anything . . . they didn't have the money, they didn't have the resources, they didn't feel the need."

Roti's Post-Trial Br. 11-13; *see also* Bankr. Ct. Op. 6-7 (summarizing evidence).

Roti alleges that within ten days after the Chapter 7 trustee's appointment, the GCCS failed, spreading malodorous gas onto hotel property and adversely affecting business. Roti testified about the smell as follows:

> A: One day we had a catastrophe. The odors came, it was sudden. It was abrupt, and it was horrible. It smelled like death. It was a horrible stench, that you could not eat, and if you were sleeping, you would have woken up in your sleep.
>
> Q: For how long did this continue?
>
> A: It continued through the period of time that – well, past the time that the hotel was sold.

Feb. 9, 2010 Tr. 138.

In November 2005, the Illinois Environmental Protection Agency (IEPA) issued notices of violation to Congress and RTC after receiving complaints of foul odors coming from the landfill. On December 19, 2005, Congress and the Chapter 7 trustee responded, admitting that "[u]nder RTC's contract the gas collection system has fallen into a state of disrepair." Letter from Congress to IEPA 3 (Dec. 19, 2005). Four days

3

later, the Chapter 7 trustee explained to the IEPA that the estate lacked the financial resources to fix the GCCS. The trustee estimated that it would take a year to bring the GCCS into compliance even if funds were available. The IEPA issued a second notice of violation to Congress and RTC on January 10, 2006.

On December 28, 2005, Congress moved the bankruptcy court to lift the automatic stay imposed during bankruptcy proceedings to allow Congress to take control of the GCCS. The bankruptcy court granted the motion on January 13, 2006. Congress then terminated its contract with RTC and began to rebuild the GCCS.

Roti alleges that shortly after Congress regained control of the GCCS, landfill gas traveling underground began to enter the hotel through electrical outlets and floor cracks, damaging hotel property. He also alleges that Markwell discovered dangerous levels of methane gas from the landfill at the hotel in February and March of 2006. For reasons unrelated to Roti's claims in this appeal, Markwell had filed for bankruptcy protection under Chapter 11 earlier in 2005. Roti testified that he had hoped to reorganize and continue operating the hotel until the gas leak devastated business. In September 2006, Markwell's trustee sold the Holiday Inn for $5,000,001, and Markwell went out of business.

In May 2006, Markwell's trustee filed an administrative claim against RTC's Chapter 7 estate seeking compensation for damages incurred by the Markwell estate as a result of the gas leak. Soon after, via a settlement agreement, Markwell's trustee assigned Roti all of Markwell's claims arising out of the gas leak. Roti amended the Chapter 7 claim, requesting compensation for out-of-pocket costs, loss of hotel revenue, damage to the land, and diminution in the hotel's market value. Roti

4

simultaneously sued Congress for damages resulting from the gas leak. He settled that suit in October 2009.

In February 2010, the bankruptcy court conducted an evidentiary hearing on the Chapter 7 administrative claim, which Roti pursued over Congress's objection. Roti presented his own testimony and that of a Chicagoland hotel market valuation expert. The bankruptcy court denied the claim on the ground that Roti "failed to establish that Markwell's injuries resulted from the Chapter 7 trustee's operation of RTC's business between September 21, 2005, the date on which the trustee was appointed, and February 7th, 2006, the date on which the trustee rejected RTC's gas collection contract." Bankr. Ct. Op. 4. This appeal followed.

## Discussion

The Court has jurisdiction under 28 U.S.C. § 158(a). The Court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010).

**A.  Causation**

Administrative expenses authorized under 11 U.S.C. § 503 receive first priority in the distribution of estate assets. 11 U.S.C. § 507(a)(1). Section 503 defines "administrative expenses" to include "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(a)(1)(A). In *Reading Co. v. Brown*, 391 U.S. 471 (1968), the Supreme Court awarded administrative expense priority to damages resulting from the tortious conduct of a Chapter 11 receiver under the predecessor statute to section 503. *Id.* at 476. Based on *Reading*, courts now recognize a category

5

of administrative expenses incurred by "claimants that are injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve . . . the estate." *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) (citations omitted); *see also In re Jartran, Inc.*, 732 F.2d 584, 588 (7th Cir. 1984); *In re Hemingway Transp., Inc.*, 954 F.2d 1, 6 (1st Cir. 1992).

The bankruptcy court held that Roti failed to demonstrate that Markwell was injured by the Chapter 7 trustee's operation of RTC's business, as required by *Reading*. The bankruptcy court reasoned that Roti failed to demonstrate that the Chapter 7 trustee "did or failed to do anything to cause the gas leakage during the brief interval the Chapter 7 estate was responsible for the gas collection system." *See* Bankr. Ct. Op. 7. The court explained:

> [T]he Chapter 7 trustee was appointed on September 21, 2005, and the gas leak became noticeable in late September 2005 and, in any event, no later than October 1, 2005. And Roti points to nothing that the trustee did in this ten-day span that caused the leak. Roti also offers no evidence that it was the continued operation of the gas collection system that caused the gas to continue to seep into Markwell's property. Indeed, there's nothing indicating that the odor problem could have been avoided had the Chapter 7 trustee declined to operate RTC's business, and the odors remained a problem through 2006 and into 2008, well after the Chapter 7 trustee relinquished any control over the gas collection system.
>
> Instead, based on the evidence offered at trial, the much more reasonable conclusion is that RTC had for many years failed to properly maintain the central gas collection system and that . . . these were long-term failures not attributable to the Chapter 7 estate's operation of the gas collection system.

*Id.* at 7-8.

Roti has provided no basis to overturn the bankruptcy court's ruling. His sole

6

argument in his opening brief is that the Chapter 7 trustee necessarily caused his damages because the trustee controlled the gas system on October 1, 2005, when the gas leak began. In support, Roti cites cases indicating that no tort claim "exists for purposes of the Bankruptcy Code until the injury occurs." *In re Conesco*, 330 B.R. 673, 685 (N.D. Ill. 2005); *see also Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000) ("[B]efore a tort occurs the potential victim has no legal right."). Roti also cites 11 U.S.C. § 726(b), which states that an administrative claim "allowed under section 503(b) of this title incurred under [Chapter 7]" takes priority over a Chapter 11 administrative claim.[1]

*Fogel* and *Conseco* are inapposite. *Fogel* and *Conesco* held that tort claimants who suffered injury after a tortfeasor entered bankruptcy had post-petition claims that survived the bankruptcy and could be asserted against the reorganized debtor. *See Fogel*, 221 F.3d at 965; *Conesco*, 330 B.R. at 684. These cases do not indicate that tort claims qualify for administrative priority under *Reading* merely because an injury occurred during the tenure of a Chapter 7 trustee. Likewise, section 726(b) provides that a Chapter 7 claim has priority over a Chapter 11 claim; it does not eliminate the requirement in *Reading* that an administrative expense claimant prove the trustee

---

[1] 11 U.S.C. § 726(b) provides, in full:

Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6), (7), or (8) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter under sections 1009, 1112, 1208, or 1307 of this title, a claim allowed under section 503(b) of this title incurred under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter of this title or under this chapter before such conversion and over any expenses of a custodian superseded under section 543 of this title.

7

caused the claimant's injuries through its operation of the debtor's business.

In his reply brief, Roti raises several additional responses for the first time. Arguments raised for the first time in the reply brief are forfeited. *See Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 930 n.4 (7th Cir. 1998) (citing *Marie O. v. Edgar*, 131 F.3d 610, 614 n.7 (7th Cir. 1997)). Even if this Court were to consider the arguments, however, they fail.

Roti argues that the Chapter 7 estate had an obligation to prevent the migration of landfill gas to neighboring properties under state law. He also argues that the inaction of the Chapter 7 estate caused his damages. Roti failed to demonstrate, however, that his injuries resulted from the trustee's violation of any state law duty or responsibility. *See* Bankr. Ct. Op. 10-11; *see also Leavell v. Karnes*, 143 B.R. 212, 219 (S.D. Ill. 1990) (remanding because the record was "unclear as to whether the contamination is due solely to the trustee's conduct, or whether the environmental violations began while the properties were under Mr. Leavell's control and merely continued under the trustee's operation"). Likewise, he provided no evidentiary support for his assertion that the trustee's inaction caused his damages. *See also In re Weinschneider*, 395 F.3d 401, 403 (7th Cir. 2005) (denying an administrative claim in part because the trustee "was acting properly.").

Roti also disputes that he is required to show that the Chapter 7 trustee caused his damages, arguing instead that to qualify for administrative expense priority, he need only demonstrate that the Chapter 7 trustee committed a state law tort. Even if this were true, Roti failed to establish trespass or nuisance under Illinois law. Both torts

8

require proof of a negligent or intentional act, which Roti failed to provide. *See Millers Mut. Ins. Ass'n of Illinois v. Graham Oil Co.*, 282 Ill. App. 3d 129, 139, 668 N.E.2d 223, 230 (1996) ("In Illinois, one may be liable in trespass for causing a thing . . . to enter the land of another either through a negligent act or an intentional act."); *Porter v. Urbana-Champaign Sanitary Dist.*, 237 Ill. App. 3d 296, 303, 604 N.E.2d 393, 398 (1992) (An "[u]nintentional, nonnegligent intrusion does not form a basis for [trespass] liability even if the entry onto the land caused harm to a legally protected interest."); *In re Chicago Flood Litig.*, 176 Ill. 2d 179, 204, 680 N.E.2d 265, 277 (1997) ("A private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land. The invasion must be: substantial, either intentional or negligent, and unreasonable."); *see also Dial v. City of O'Fallon*, 81 Ill. 2d 548, 556-59, 411 N.E.2d 217, 221-23 (1980); *Sprague Farms, Inc. v. Providian Corp.*, 929 F. Supp. 1125, 1129 nn. 3, 5 (C.D. Ill. 1996); *Malone v. Ware Oil Co.*, 179 Ill. App. 3d 730, 731, 534 N.E.2d 1003, 1003 (1989). Contrary to Roti's suggestion, strict liability applies only in the case of a trespass involving an ultra-hazardous activity, *see Dial*, 81 Ill. 2d at 553, 411 N.E.2d at 220, which Roti failed to allege or prove.

The bankruptcy court also cited a second independent ground for its holding that Roti failed to establish causation: Roti did not "demonstrate that it was more likely than not that RTC rather than Congress caused his damages." Bankr. Ct. Op. 6 (emphasis added). Because the Court affirms the bankruptcy court's decision on the first ground, it need not address this ground nor any other basis for affirmance raised by Congress.

9

**B.     Settlement with Congress**

Roti argues that the bankruptcy court improperly held the settlement between Congress and Roti against him.  Specifically, in support of its conclusion that Roti failed to show that RTC, rather than Congress, caused the gas leak, the bankruptcy court observed that "Roti previously filed a lawsuit against Congress seeking damages for precisely the same harm that he now alleges was RTC's responsibility, and Mr. Roti obtained a sizeable settlement payment from Congress."  *Id.* at 5.

Federal Rule of Civil Procedure 61 instructs reviewing courts "to disregard any error that did not affect a party's substantial rights."  *See In re Bartle*, 560 F.3d 724, 730 (7th Cir. 2009) (applying Rule 61 to review of bankruptcy court orders).  An error does not affect a party's substantial rights if it did not alter the court's decision.  *Id.* (citations omitted).

Any error by the bankruptcy court in considering the settlement was harmless, as it did not alter the outcome of the case.  The bankruptcy court's determination that Roti failed to show that the Chapter 7 trustee caused Markwell's injuries in its operation of RTC's business was fatal to his administrative expense claim.

**C.      Congress's Alleged Admissions and Chapter 7 Administrative Claim**

Roti argues that the bankruptcy court erroneously denied him the benefit of Congress's admissions and created an unjust result by permitting Congress to recover an administrative claim from the Chapter 7 estate while denying his own claim.

As a preliminary matter, Roti arguably forfeited this argument by failing to cite any relevant legal principle and authority in support of his claim.  *See* Roti's Br. 38-40;

Roti's Reply Br. 17-19.  The Seventh Circuit has made clear that failure to properly develop an argument with citation to relevant legal argument and authority constitutes a waiver.  See *Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) (citing *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004)); *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) (noting that it is not the duty of the courts to construct parties' legal arguments for them).

The sole case cited by Roti in support of his argument, *Murray v. United States*, 73 F.3d 1448 (7th Cir. 1996), is inapplicable.  In *Murray*, the Seventh Circuit reversed a trial judge's decision to exclude evidence, reasoning that extrajudicial admissions by a party opponent are admissible, though not conclusive.  *Id.* at 1455.  In this case, the bankruptcy court did not exclude any alleged admissions.  Indeed, the bankruptcy referenced certain admissions in its oral decision.  See Bankr. Ct. Op. 10.

Moreover, the alleged admissions do not alter the result in this case.  Roti first argues that Congress admitted the Chapter 7 estate's "responsibility" for the gas leak in a letter responding to the IEPA's notices of violation.  See Roti's Op. Br. 39.  Roti identifies no specific statements in the letter, nor is the Court aware of any, that suggest that the Chapter 7 trustee caused Roti's injuries.  Congress noted in the letter that it "has objected to the chapter 7 trustee's efforts to extend the time in which he may assume the CDC-RTC Agreement, and has been in active negotiations with the chapter 7 trustee in an effort to restore control of the maintenance and operations of the [GCCS] to CDC."  Letter from Congress to IEPA 3 (Dec. 19, 2005).  But Roti provides no evidence indicating that any delay by the Chapter 7 trustee in transferring control of

the GCCS to Congress caused Markwell's damages.  Indeed, Roti admits that the gas leak began within ten days after the appointment of the Chapter 7 trustee and continued well beyond Congress's assumption of control over the GCCS.

Second, Roti contends that Congress blamed the Chapter 7 trustee for the gas leak in a motion requesting termination of the bankruptcy automatic stay.  In the motion, however, Congress merely stated that the Chapter 7 trustee acknowledged "that the gas collection facility is substantially incomplete and in a dismal state of disrepair" and that "the estate lacks the capital necessary to complete the system as designed or bring it into compliance with governing environmental requirements."  Congress Mot. for Relief from Automatic Stay 3-4.  These observations do not establish that the trustee caused any of Markwell's injuries in its operation of the estate.

Third, Roti argues that Congress blamed the Chapter 7 trustee for the gas leak in an e-mail responding to his complaints.  The cited e-mail, dated after Congress had regained control of the GCCS, provides an update on "recent developments" affecting the GCCS and states:

> After an expensive and long, drawn-out battle with RTC, Judge Wedoff lifted the bankruptcy stay which we believe allows us to terminate the contract with RTC and regain control of the landfill gas collection and control system.  I anticipate additional court challenges and the only reason I will not work on the gas system is if a court issues an injunction.  We have a plan to replace or repair the system and are mobilizing crews to begin work.  Please be sure a system in this state cannot be repaired overnight -- it will take time.

E-mail from Arthur Daniels to Roti (Jan. 17, 2006).  The e-mail's reference to an "expensive and long, drawn-out battle with RTC" does not single out the actions of the Chapter 7 trustee, nor does the e-mail otherwise blame the Chapter 7 trustee for the gas leak.

12

Fourth, Roti contends that in a response to complaints from the Village of Hillside, Congress admitted that no injury occurred until October 2005. Letter from Arthur Daniels to Roti (Mar. 8, 2006). Roti fails to identify any statement in the response referring to an injury beginning in October 2005, nor is the Court aware of one. More importantly, such an admission would not alter the outcome in this case because, as the Court explained earlier, the date of injury is not dispositive. *See supra* at 7-8.

Fifth, Roti contends that in its responses to Roti's state court suit, Congress blamed RTC for all aspects of the gas leak. The Court's review of Roti's citations indicates that Congress blamed RTC only for damages stemming from RTC's operation of the GCCS. For example, Congress stated in its answer to Roti's state court complaint that Roti's claims based on the GCCS "are attributable to the conduct of RTC" and that Congress was not "the proximate cause of" of those damages. Congress State Ct. Answer to Roti's Compl. 25; *see also* Defs.' Joint Mem. in Opp. to Mtn. for Partial Summ. J. 33 ("[F]atal to plaintiff's theory, the record establishes without contradiction that *RTC*, not Congress, had exclusive ownership and control over the gas collection system from 1996 until the Bankruptcy Court terminated the automatic stay and Congress terminated the contract in early 2006.") (emphasis in original). Even were the Court to accept Roti's characterization of the statements and accept them in full, they would not overcome Roti's failure to demonstrate that the Chapter 7 trustee, as opposed to the Chapter 11 trustee or RTC itself, caused Markwell's injuries.

Sixth, Roti argues that Congress conceded in its post-hearing brief to the bankruptcy court that the Chapter 7 trustee was a joint tortfeasor. In the brief,

13

Congress merely argued in the alternative that if the Chapter 7 trustee was held liable, any damages should be apportioned between the Chapter 7 and Chapter 11 estates. *See* Congress Post-Trial Br. 25-28. This argument does not contradict Congress's position regarding the administrative claim reviewed in this appeal.

Finally, Roti asserts that Congress blamed the Chapter 7 trustee for the gas leak in its own administrative claim against the Chapter 7 estate. *See* Congress Req. for Payment of Ch. 7 Admin. Expenses. He argues further that the bankruptcy court permitted an unjust result by allowing Congress to receive an administrative expense allowance of $1.5 million pursuant to an agreement between Congress and the RTC estate. Roti does not identify any specific statements in Congress's Chapter 7 administrative claim that conflict with its position here.

**Conclusion**

For the foregoing reasons, the Court directs the Clerk to enter judgment affirming the decision of the bankruptcy court.

								_____
								MATTHEW F. KENNELLY
								United States District Judge

Date: December 10, 2010